1  KEKER, VAN NEST & PETERS LLP
   KHARI J. TILLERY - # 215669
2  ktillery@keker.com
   AJAY S. KRISHNAN - # 222476
3  akrishnan@keker.com
   PUJA PARIKH - # 331823
4  pparikh@keker.com
   633 Battery Street
5  San Francisco, CA 94111-1809
   Telephone:    415 391 5400
6  Facsimile:    415 397 7188

7  Attorneys for Defendant AGI7 INC.

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11

12  TURING VIDEO TECHNOLOGY, INC.,          Case No. 5:24-cv-04606-SVK

              Plaintiff,                    **DEFENDANT AGI7 INC.'S MOTION TO
13                                          STAY THE ACTION AND COMPEL
                                            ARBITRATION; MEMORANDUM AND
         v.                                 POINTS OF AUTHORITY IN SUPPORT
14                                          THEREOF**
    AGI7 INC.,
15                                          Date:       September 10, 2024
              Defendant.                    Time:       10:00 a.m.
16                                          Dept:       Courtroom 6 – 4th Floor
                                            Judge:      Hon. Susan van Keulen
17
18                                          Complaint Filed:    June 26, 2024

19                                          Action Removed:     July 30, 2024

20

21           REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

22

23

24

25

26

27

28

---

DEFENDANT AGI7 INC.'S MOTION TO STAY ACTION AND COMPEL ARBITRATION; MEMORANDUM
AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION.................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.  INTRODUCTION ................................................................................................ 1

II.  BACKGROUND .................................................................................................. 2

    A.  Cao's Departure from Turing and AGI7's Founding ............................ 2

    B.  The Release and Arbitration Agreement ................................................ 3

    C.  Turing's Allegations ................................................................................. 4

III.  LEGAL STANDARD .......................................................................................... 5

IV.  ARGUMENT ....................................................................................................... 6

    A.  The Release Agreement Contains an Agreement to Arbitrate .............. 7

    B.  AGI7 Can Enforce the Agreement to Arbitrate Against Turing Because the Agreement Covers the Dispute ......................................................... 7

        1.  The Claims Against AGI7 are Arbitrable Under the Doctrine of Equitable Estoppel ....................................................................... 8

            a.  Turing's claims against AGI7 rely upon or are intimately founded in and intertwined with the Release Agreement ............... 9

            b.  Turing alleges substantially interdependent and concerted misconduct by AGI7 and Cao, and such allegations are founded in or intimately connected with the Release Agreement ............... 12

        2.  The Claims Against AGI7 Are Arbitrable Based on Plaintiff's Allegations that AGI7 and Cao are Alter Egos ....................... 15

    C.  Plaintiff's Claims Against AGI7 Should Be Stayed Pending Arbitration ........... 16

V.  CONCLUSION .................................................................................................... 17

i

DEFENDANT AGI7 INC.'S MOTION TO COMPEL ARBITRATION; MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Amisil Holdings Ltd. v. Clarium Cap. Mgmt.*,
    622 F. Supp. 2d 825 (N.D. Cal. 2007) ............................................................................. 8

*In re Apple & AT&T Antitrust Litigation*,
    826 F. Supp.2d 1168 (N.D. Cal. 2011) ..................................................................... 7, 14

*Borelli v. Black Diamond Aggregates, Inc.*,
    2017 WL 1063564 (E.D. Cal. Mar. 21, 2017)...................................................15, 16

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) .............................................................................. 6, 7

*Brown v. Gen. Steel Domestic Sales, LLC*,
    2008 WL 2128057 (C.D. Cal. May 19, 2008)............................................6, 7, 8

*Cap Diagnostics, LLC v. Emeritus Med. Tech. LLC*,
    2023 WL 8351561 (C.D. Cal. Oct. 25, 2023) ........................................7, 13, 14

*Chartwell Staffing Services v. Atlantic Solutions Group*,
    2020 WL 620294 (C.D. Cal. Jan. 9, 2020) .........................................................11, 12

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) ............................................................................. 6

*Coinmint, LLC v. DX Corr Design, Inc.*,
    2023 WL 9595893 (N. D. Cal. 2023) .................................................................11, 12

*Comer v. Micor, Inc.*,
    436 F.3d 1098 (9th Cir. 2006) .............................................................................. 8

*Daley v. CVS Pharmacy, Inc.*,
    727 Fed. Appx. 377 (9th Cir. 2018)..................................................................... 5

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) ............................................................................................. 6

*Franklin v. Comty. Reg'l Med. Ctr.*,
    998 F.3d 867 (9th Cir. 2021)................................................................................ 9

*Gilmer v Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991).............................................................................................. 6

*Green Tree Fin. Corp.-Ala. v. Randolph*,
    531 U.S. 79 (2000)............................................................................................... 7

ii

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

*GT Secs., Inc. v. Klastech GmbH*,
  2014 WL 2928013 (N.D. Cal. June 27, 2014) ........................................................ 5

*Herrera v. Cathay Pac. Airways Ltd.*,
  104 F.4th 702 (9th Cir. 2024) .............................................................................. 9

*Herrera v. Cathay Pac. Airways Ltd.*,
  94 F.4th 1083 (9th Cir. 2024) ............................................................................ 12

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 .................................................................................................... 9

*Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*,
  2016 WL 6082415 (N.D. Cal. Oct. 18, 2016) ...................................................... 8

*In re: Lithium Ion Batteries Antitrust Litig.*,
  2016 WL 5791356 (N.D. Cal. Oct. 4, 2016) ........................................................ 8

*Lovig v. Best Buy Stores LP*,
  2019 WL 2568851 (N.D. Cal. June 21, 2019) ................................................ 6, 16

*Michael Yadegari et al v. Ford Motor Company et al*,
  2023 WL 11067049 (C.D. Cal. 2023) ................................................................ 15

*Mortensen v. Bresnan Commc'ns, LLC*,
  722 F.3d 1151 (9th Cir. 2013) ............................................................................. 7

*Prograph Int'l Inc. v. Barhydt*,
  928 F. Supp. 983 (N.D. Cal. 1996) .................................................................... 15

*Tradeline Enters. Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC*,
  772 Fed. App'x 585 (9th Cir. 2019) ..................................................................... 8

*United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*,
  46 Fed. App'x 412 (9th Cir. 2002) ..................................................................... 16

*Viking River Cruises, Inc. v. Moriana*,
  596 U.S. 639 (2022) ............................................................................................ 7

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) ............................................................................................ 6

**State Cases**

*Lathrop v. HealthCare Partners Med. Grp.*,
  114 Cal. App. 4th 1412, 8 Cal. Rptr. 3d 668 (2004) .......................................... 11

*Metalclad Corp. v. Ventana Env't Organizational P'ship*,
  109 Cal. App. 4th 1705 (2003) ............................................................................ 9

iii

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

**Federal Statutes**

9 U.S.C. § 2..................................................................................................................... 7

9 U.S.C. § 3................................................................................................................. 1, 16

**Rules**

Fed. R. Civ. P. 12............................................................................................................ 5

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

**NOTICE OF MOTION**

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on September 10, 2024, at 10:00 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Susan van Keulen, located at San Jose Courthouse, Courtroom 6 – 4th Floor, 280 South 1st Street, San Jose, CA 95113, Defendant AGI7 Inc. ("Defendant") will and hereby do move this Court to compel arbitration of Plaintiff's claims against Defendant.

This motion is brought pursuant to Sections 3 and 4 of the Federal Arbitration Act. This motion is based on this Notice of Motion, the following Memorandum of Points and Authorities, the accompanying Declaration of Puja Parikh and the exhibits attached thereto, the pleadings and other documents on file in this case, all other matters of which the Court may take judicial notice, and any further argument or evidence that may be received by the Court at the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This case is an attempt by Turing to derail an innovative startup whose intelligent video surveillance platform is different from and superior to Turing's technology. Turing's allegations against AGI7 are false: AGI7's founder Song Cao did not take Turing's source code, much less develop AGI7's groundbreaking technology based on Turing's trade secrets. On the contrary, AGI7 developed its technology from scratch, after its founder left Turing.

AGI7 will disprove each of Turing's claims. But the proper forum for that is arbitration, not this Court. Turing alleges misconduct by Cao immediately following his departure from the company, claiming that he retained his Turing-issued laptop to access Turing's source code, which was then allegedly used to create AGI7's technology. But one month after Cao departed Turing—*i.e.*, **after** that alleged misappropriation—Cao and Turing entered into a Mutual Release of Claims Agreement ("Release Agreement" or "Agreement"), where Turing released Cao of that same alleged conduct.

As this dispute falls within the Release Agreement, it must be arbitrated. The Agreement states, in relevant part, that "███████████████████████████████████████

1

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

1 ██████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████ [.]"

3 Declaration of Puja Parikh ("Parikh Decl.") Ex. 1 § 24. The "█████████████████████

4 ████████████████████████████████████████████████████████

5 ███████████████████████████████████████." *Id.*

6       In a transparent effort to circumvent this broad arbitration clause, Turing has cherry-

7 picked AGI7, a non-signatory to the Release Agreement, as the sole defendant. But this ploy will

8 not work. Turing's Complaint clearly alleges interrelated and concerted conduct between Cao and

9 AGI7 as the source of the alleged harm, seeks to hold AGI7 responsible for Cao's acts, and

10 advances causes of action that rely on an adjudication of the rights created by the Release

11 Agreement. Under these circumstances, the legal doctrines of equitable estoppel and alter-ego[1]

12 permit a non-signatory like AGI7 to compel arbitration.

13       As such, the Court should compel arbitration of Turing's lawsuit and stay this action until

14 the arbitration is concluded.

15 **II.    BACKGROUND**

16     **A.    Cao's Departure from Turing and AGI7's Founding**

17       Cao founded Turing in 2017 and served as its CEO and Chairman of the Board of

18 Directors. Turing offers a variety of products, including a range of surveillance video cameras.

19 Turing also sells access to Turing Vision, a platform that allows customers to manage multiple

20 security cameras on one platform. On July 28, 2023, Cao left his employment at Turing.

21       On August 5, 2023, Turing's counsel emailed Cao's counsel to state that ███████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████ [.]" Parikh Decl.,

24 Ex. 2 at 4. Turing's counsel stated this discussion would involve allegations that after Cao

25 "step[ped] down as CEO (███████████████████████████████████

26 ████████████████████████ [.]" *Id.* at 2.

---

[1] As explained below, this is not to say that AGI7 and Cao are in fact alter egos; rather, Turing's lawsuit effectively treats them as such. *See infra* § IV.B(2).

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

On August 15, 2023, Cao filed corporate documents founding AGI7, a web-based software-as-a-service video monitoring company. Cao is AGI7's current CEO. Its product, Alpha Vision AI—in contrast to Turing's video management platform—allows customer to integrate their existing security cameras into its platform and uses artificial intelligence features to improve the efficiency and security of the customer's existing camera set-up.

**B.     The Release and Arbitration Agreement**

On August 30, 2023, over a month after leaving Turing and after AGI7's founding—and *after* ███████████████████████████████████—Cao and Turing entered into a Mutual Release of Claims Agreement. Parikh Decl., Ex. 1. In the Agreement, Cao agreed to ████████████████████████████, and Turing agreed to ████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

*Id.* § 9(i)(1). The parties also entered into ████████████████████████████
████████████████████████████████████████████████
██████ [.]" *Id.* § 9(ii)(b).

The Release Agreement additionally included provisions ████████████████
████████████████, stating that Cao "████████████████████████████████
████████████████████████████████████████████
████████████ [.]" *Id.* § 15(c). Notably, this section also included an agreement regarding ████████████████████████████████████████████
████████████████████████████████████." *Id.* § 15(d). Section 15(d) lays out ████████████████████████████████████████████
████████████████████████)[.]" *Id.*

Finally, the Release Agreement includes ████████████████████, *id.* § 23, and ████████████████. *Id.* § 24. ████████████████████

3

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573



*Id.*

### C.  Turing's Allegations

On April 22, 2024, Turing sent both Cao and AGI7 a cease-and-desist letter, claiming that they are " ████████████████████████████." Parikh Decl., Ex 3 at 1.  Turing maintains that ████████ ████████████████████ and that "████████████████████ ████████████████ and that "████████████████████ ████████████████████████████████ " *Id.* Turing contends that AGI7 and Cao's "████ ████████████████████████████████ " and directly references the Release Agreement's (referred to as the "Separation Agreement" in the letter) provision 15(c) ████████████████████████████. *Id.* at 2. ("████████████████████ ████████████████████████████████████ ████████████).

On June 26, 2024, Turing filed suit against AGI7. Turing alleges that "Cao [is] AGI7's current [CEO], Chief Financial Officer, and Secretary," Compl. ¶ 5, and "Cao founded AGI7 two weeks [after leaving Turing], using Turing's Trade Secrets and Confidential Information." *Id.* ¶ 11. Specifically, Turing contends that on August 3, 2023, it alerted Cao's counsel about Cao's possession of a Turing-issued laptop, *Id.* ¶ 32, and that "[d]uring that month . . . Cao used the Turing Laptop, (or information from the Turing laptop synced to his other devices) to transfer

Turing code into an account controlled by his new company, AGI7[.]" *Id.* ¶ 34. Turing specifically alleges that "[i]n or around the first two weeks of August 2023, Cao created a GitHub account[2] for AGI7," *Id.* ¶ 37, and another domain, and "over the next several weeks, Cao went back and forth between the GitHub accounts, logging in and out of each of them, using either his Turing Laptop or a device that was synced to his Turing Laptop." "This made it possible for Cao to transfer Turing's code from Turing's GitHub account, and from the Turing Laptop (or accounts to which the Turing Laptop was synced), to the GitHub accounts for AGI7[.]" *Id.* ¶¶ 39, 40. The Complaint alleges Cao formed AGI7 on August 15, 2023. *Id.* ¶ 41; *see also id.* Ex. 1.

Turing next alleges that "[i]n the fourth quarter of 2023," AGI7 began hiring former Turing employees and directed them to access Turing's server "to obtain and steal product information and source code." *Id.* ¶¶ 43-44. The Complaint goes on to allege that, ostensibly under Cao's direction, the former Turing employees now working for AGI7 engaged in further violative actions. *Id.* ¶¶ 43-45; 49-61. Finally, the Complaint claims that on April 10, 2024, AGI7 unveiled its platform at a conference. *Id.* ¶ 64.

Turing asserts three causes of action against AGI7: misappropriation of trade secrets under state (claim 1) and federal law (claim 2), and unlawful business practices pursuant to state law (claim 3). Turing seeks an injunction, actual and compensatory damages, enhanced damages, exemplary damages, recovery of attorneys' fees, and restitution.

## III.   LEGAL STANDARD

A party in federal court may enforce an arbitration agreement by filing a motion to compel pursuant to Rule 12(b)(1). *See, e.g.*, *Daley v. CVS Pharmacy, Inc.*, 727 Fed. Appx. 377, 377-78 (9th Cir. 2018) (affirming district court's grant of motion to compel arbitration under Fed. R. Civ. P. 12(b)(1)); *see also GT Secs., Inc. v. Klastech GmbH*, 2014 WL 2928013, at *2 n.4 (N.D. Cal. June 27, 2014) (explaining that "[i]n the Ninth Circuit," motions to compel arbitration "fall under Rule 12(b)(1) of the Federal Rules of Civil Procedure").

The Supreme Court has repeatedly emphasized that the Federal Arbitration Act ("FAA")

---

[2] According to the Complaint, "GitHub is a developer platform that allows developers, like Turing's employees, to create, store, manage, and share code." *Id.* ¶ 17.

creates a strong, liberal federal policy that favors arbitration. *See, e.g., Gilmer v Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). On a motion to compel arbitration, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Thus, in evaluating the instant motion, the Court's inquiry is limited to two issues: "(1) whether there is an agreement to arbitrate . . . and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).

In addition, if a court determines that some, but not all, claims are arbitrable, the FAA mandates that the court "shall" stay the action in its entirety "until the contracted-for 'arbitration has been had in accordance with the terms of the agreement.'" *Lovig v. Best Buy Stores LP*, 2019 WL 2568851 at *3 (N.D. Cal. June 21, 2019) (quoting FAA and staying "the entire action" pending resolution of arbitration where "some but not all" claims were arbitrable).

## IV.   ARGUMENT

Both prongs of the *Brennan* inquiry—(1) whether there is an agreement to arbitrate and (2) whether the agreement covers the dispute—are present here. 796 F.3d at 1130. The release agreement contains a valid agreement to arbitrate. And AGI7 can enforce the arbitration clause in the Release Agreement because Turing's claims fall within the Agreement.

***First***, Turing is equitably estopped from litigating its claims against AGI7 in court on two separate grounds: (1) Turing's claims rely on or are intimately connected with and intertwined with the provisions of the Release Agreement; and (2) the Complaint alleges substantially interdependent and concerted misconduct by AGI7 and Cao. In essence, this case "presents a classic example of a lawsuit against non-signatories that is inseparable from claims asserted against a signatory," and as a result, it "is necessary" to compel Turing to arbitrate its claims against AGI7 "to preserve the benefit of the arbitration clause for [Cao]." *Brown v. Gen. Steel*

1  *Domestic Sales, LLC*, 2008 WL 2128057, at *8 (C.D. Cal. May 19, 2008).

2  **Second** and in the alternative, based on Turing's allegations regarding the relationship

3  between AGI7 and Cao, the Court should apply the alter-ego doctrine and allow AGI7 to enforce

4  the arbitration clause.

5  The Court should thus compel arbitration and stay the case.

6  **A.**   **The Release Agreement Contains an Agreement to Arbitrate**

7  First, under the FAA, agreements to arbitrate are presumptively valid and enforceable.

8  *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 649 n.9 (2022). The FAA contains an

9  "enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal

10  law," *id.* at 650, and permits invalidation of arbitration clauses only "upon such grounds as exist

11  at law or in equity for the revocation of any contract," 9 U.S.C. § 2. In general, in the case of an

12  executed agreement that contains an arbitration clause, the analysis under this prong of the

13  *Brennan* test is perfunctory unless a party challenges the arbitration clause as unconscionable or

14  invalid. The burden of proving unenforceability of an arbitration provision remains at all times

15  with the party challenging said provision. *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151,

16  1157 (9th Cir. 2013) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)).

17  Here, it is uncontroversial that Turing executed the Release Agreement and ███████

18  ███████████████████████████████████████████. Parikh Decl., Ex. 1 § 24. Indeed, in

19  its pre-lawsuit demand letter, Turing alleged ████████████████████—thus evincing

20  Turing's position that this Agreement is valid and enforceable. Parikh Decl., Ex. 3.  Turing

21  cannot overcome its burden of proving the invalidity or enforceability of the arbitration clause in

22  the Release Agreement.

23  **B.**   **AGI7 Can Enforce the Agreement to Arbitrate Against Turing Because the**
         **Agreement Covers the Dispute**

24

25  Second, enforceability of the agreement to arbitrate is typically assessed as part of the

26  second prong of the *Brennan* inquiry—whether the agreement to arbitrate covers the claims. *See,*

27  *e.g.*, *Brown*, 2008 WL 2128057, at *9; *Cap Diagnostics, LLC v. Emeritus Med. Tech. LLC*, 2023
     WL 8351561 (C.D. Cal. Oct. 25, 2023); *In re Apple & AT&T Antitrust Litigation*, 826 F. Supp.2d

28

7

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

1168, 1177 (N.D. Cal. 2011).

The Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state law allows the litigant to enforce the agreement. *Tradeline Enters. Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC*, 772 Fed. App'x 585, 586 (9th Cir. 2019); *Levi Strauss & Co. v. Aqua Dynamics Sys., Inc.*, 2016 WL 6082415, at *5 (N.D. Cal. Oct. 18, 2016). California law applies here. *In re: Lithium Ion Batteries Antitrust Litig.*, 2016 WL 5791356, at *3 (N.D. Cal. Oct. 4, 2016) (applying the relevant state law as the "arbitration provisions indicate that the laws of [that] state . . . apply to the contracts"); *see also* Parikh Decl., Ex. 1 § 23 ("The Agreement will be interpreted under, construed, and governed by the laws of the State of California, both as to interpretation and performance without taking into account conflict of law principles.").

Under California law, "[g]eneral contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories." *Levi Strauss & Co*, 2016 WL 6082415, at *5 (quotation omitted). Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *see also Gen. Steel Domestic Sales, LLC,* 2008 WL 2128057, at *6 ("signatories can be required to arbitrate claims brought by nonsignatories 'at the nonsignatory's insistence because of the close relationship between the entities involved.'"). Moreover, "arbitration is more likely to be attained when the party resisting arbitration"—here, Turing—"is a signatory."*Amisil Holdings Ltd. v. Clarium Cap. Mgmt.*, 622 F. Supp. 2d 825, 831 (N.D. Cal. 2007).

In the present case, Turing's claims against AGI7 are arbitrable under the doctrine of equitable estoppel and the alter-ego theory.

### 1. The Claims Against AGI7 are Arbitrable Under the Doctrine of Equitable Estoppel

California law "allows a nonsignatory to invoke arbitration under the doctrine of equitable estoppel even when a signatory 'attempts to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims

2758573

against signatory defendants.'" *Franklin v. Comty. Reg'l Med. Ctr.*, 998 F.3d 867, 870-71 (9th Cir. 2021) (affirming order compelling arbitration under doctrine of equitable estoppel as the purpose of the doctrine is to "prevent[] a party from playing fast and loose with its commitment to arbitrate, honoring it when advantageous and circumventing it to gain undue advantage'"). This is equally true when a signatory sues only the non-signatory and not the related signatory. *Id.* at 875. Thus, "[e]stoppel prevents [a party] from avoiding arbitration by suing only the [non-signatory] corporation in these circumstances. Otherwise, the arbitration proceedings between the two signatories would be rendered meaningless." *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal. App. 4th 1705, 1718 (2003) (quotation marks and brackets omitted).

Pursuant to the prevailing case law, the doctrine of equitable estoppel applies to claims against nonsignatories in either of two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or "the claims [against the non-signatory] are 'intimately founded in and intertwined with' the underlying contract," and (2) "when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement." *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707, n.5 (9th Cir. 2024); *see also Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29. This case presents both circumstances.

### a. Turing's claims against AGI7 rely upon or are intimately founded in and intertwined with the Release Agreement

The claims Turing advances against AGI7 are premised upon Cao's purported use of Turing's intellectual property—memorialized and agreed upon in the Release Agreement executed by Turing and Cao. Moreover, AGI7 has a defense in this lawsuit that at least part of the conduct that Turing alleges has been released pursuant to the terms of the Agreement. For these reasons, Turing's claims are "rely upon" or are "intimately founded in and intertwined with" the obligations of the Release Agreement. *Herrera*, 104 F.4th at 707.

***First***, the Release Agreement establishes Turing's ███████████████ that it now claims Cao has misappropriated. Parikh Decl., Ex. 2 §§ 15(c)-(e). Specifically, "█████

1     ████████████████████████████████████████████████████

2     ██████████████" *Id.* § 15(c). The Release Agreement also governs ███

3     ███████████████████████████████████████████. *Id.*,

4     §§ 15(d) & (e). It further governs ██████████████████████, which served,

5     in part, as Turing's (albeit misinformed) basis for this lawsuit. *See* Compl., ¶¶ 36-39 (claiming—

6     albeit incorrectly—based on a "forensic review of Cao's Turing Laptop" pursuant to the Release

7     Agreement, that Cao "went back and forth" between AGI7's and Turing's GitHub accounts for

8     storing source code). Further, the Release Agreement required Cao to ████████████████

9     ████████████████████████████████. Parikh Decl., Ex. 1 § 15(e). In short,

10     ██████████████████████████████████████████████████████

11     ██████████████████████████—were established by the

12     Release Agreement. Turing's claims therefore clearly rely upon or are intimately founded in and

13     intertwined with the Release Agreement.

14          ***Second***, AGI7 has a significant defense—namely that Turing has released some of the

15     conduct that it now asserts—based on an adjudication of the Release Agreement. Critically, this is

16     ***not*** a defense that AGI7 needs to prove at this stage in the litigation in order to establish a right to

17     arbitration. Rather, the point is that this is a merits defense that AGI7 has and that must be

18     adjudicated as part of Turing's claims. For this separate reason, Turing's claims against AGI7

19     rely upon or are intimately founded in and intertwined with the Release Agreement.

20          The Release Agreement covers "██████████████████████████████

21     ██████████████████████████████" that "████████████████

22     ████████████████████████████████████

23     ██████." Parikh Decl., Ex. 1 § 9(a)(i)(1) & (i)(2)(ii). In its Complaint, Turing alleges that Cao

24     misappropriated Turing's source code between the time that he left the Company on July 28,

25     2023 and the signing of the Release Agreement on August 30, 2023. Compl. ¶¶ 36-40 (describing

26     how an analysis of the laptop, which Cao relinquished to his counsel in late August 2023,

27     allegedly evidenced misappropriation of the source code).

28          But Turing clearly had actual knowledge or inquiry notice of alleged misappropriation or

10
DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

source code by August 30, 2023, when it signed the Release Agreement—and, as such, conduct that Turing is suing over now falls within the scope of the Agreement. We know that Turing had such notice or knowledge both because Turing emailed Cao's counsel on August 5, 2023 alleging ████████████████████ (Parikh Decl., Ex. 2) and because Turing was sufficiently aware of the issue that it negotiated for and obtained a right to █████████████ in the Release Agreement. AGI7 therefore has a defense that Turing released any claim associated with Cao's alleged misappropriation of source code prior to August 30, 2023—which is clearly part of the conduct that Turing is suing over now.

Nor does it matter that the release in the Agreement covers only ████████████ ████. This is because in this lawsuit, Turing purports to hold AGI7 liable for Cao's conduct. But AGI7's vicarious liability for Cao's conduct is "wholly dependent upon or derived from the liability of the employee"; therefore "any substantive defense that is available to the employee inures to the benefit of the employer." *Lathrop v. HealthCare Partners Med. Grp.*, 114 Cal. App. 4th 1412, 1423, 8 Cal. Rptr. 3d 668, 675–76 (2004). In other words, AGI7 is entitled to the same defenses that Cao has, including Cao's release defense.

Accordingly, because AGI7 has a significant defense that turns on an adjudication of Cao's rights under the contract, Turing's claims in this case rely upon or are intimately founded in and intertwined with the Release Agreement.

For these same reasons, Turing's claims against AGI7 are "based on the same facts and are inherently inseparable" from its executed Release Agreement with Cao and the Complaint describes an "integral relationship between Defendant [AGI7] and [Cao]." *Id.*; *see also Coinmint, LLC v. DX Corr Design, Inc.*, 2023 WL 9595893 at *3 (N. D. Cal. 2023) (finding equitable estoppel appropriate under first prong).

*Chartwell Staffing Services v. Atlantic Solutions Group* is instructive here. 2020 WL 620294, at *1 (C.D. Cal. Jan. 9, 2020). Former employees of the plaintiff, Chartwell, had previously entered into employment agreements with Chartwell, with some agreements containing arbitration provisions. Chartwell filed an action against defendants, including non-signatory company Atlantic Solutions Group—a purported beneficiary of the misappropriation,

11

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

the same role that AGI7 has here—asserting DTSA violations, unfair business practices, and other claims. *Id.* The non-signatory defendants moved to compel arbitration. *Id.*, at *2. While Chartwell argued it did not file a claim for breach of contract, the court concluded that "Chartwell's trade secrets claims are not unrelated or merely incidental to the arbitration-mandating Employment Agreements. Rather, Chartwell has set forth allegations that constitute the exact conduct forbidden by the Employment Agreements." *Id.*, at *6.

So too here, where Turing's trade secret and unfair business practice allegations are premised on Cao's actions in creating AGI7, purportedly by misusing Turing's source code and intellectual property. Turing, like the plaintiff in *Chartwell*, "has set forth allegations that constitute the exact conduct forbidden by the [Release] Agreement[]. *Id.*, at *6. *See also Coinmint, LLC.*, 2023 WL 9595893, at *3 (compelling arbitration under the first category of equitable estoppel cases based on the nexus between the agreement containing the arbitration clause and the plaintiff's claims against the defendant, as well as the integral relationship between the signatory and non-signatory defendants).

Nor does it matter that the Complaint may include other allegations that do not implicate the Release Agreement. That is because "California law does not require that every allegation in the complaint be intertwined with the contract containing the arbitration clause for equitable estoppel to apply." *Herrera v. Cathay Pac. Airways Ltd.*, 94 F.4th 1083, 1089 (9th Cir. 2024) (amended on other grounds). Arbitration is therefore appropriate here.

        **b.**    ***Turing alleges substantially interdependent and concerted misconduct by AGI7 and Cao, and such allegations are founded in or intimately connected with the Release Agreement***

Turing's case against AGI7 is likewise one that alleges substantially interdependent and concerted misconduct by non-signatory AGI7 and signatory Cao. As discussed *infra* § IV.B(2), Turing imputes Cao's knowledge, intent, and actions to AGI7, starting with AGI7's inception. Compl. ¶ 11 ("Cao founded AGI7 . . . using Turing's Trade Secrets and Confidential Information"). The crux of the Complaint is that "[t]he timeframe . . . in which AGI7 purports to have built its surveillance product **would not have been possible unless** AGI7 had used Turing's Trade Secrets and Confidential Information"—the very information that Turing alleges Cao

possessed and used to create AGI7. *Id.* ¶ 14. Indeed, Turing's entire Complaint against AGI7 would be unintelligible without its interdependent allegations of Cao's conduct in forming AGI7. The Complaint claims that Cao used his Turing Laptop "to create a . . . account for his new business, AGI7, and to transfer Turing's source code into AGI7"). *Id.* ¶ 12; *see also id.* ¶ 37-41 (alleging Cao "transfer[red] Turing's code from Turing's GitHub account, and from the Turing Laptop . . . to the GitHub accounts for AGI7[.]"). Turing further complains that ***Cao's knowledge*** of Turing's purported measures to protect its code also resulted in the alleged violations ***by AGI7***. *Id.* ¶ 28 ("As the Co-Founder and Chief Executive Office of Turing, Cao, in particular, had access to a broad range of highly proprietary, trade secret . . . [information]. He also had extensive knowledge of Turing's security systems that has allowed him to thwart those systems and obtain Turing's code even after his departure from Turing.").

These allegations of concerted and interconnected misconduct are founded in and intimately connected with Cao and Turing's Release Agreement. As discussed above, *supra* § II.B, the Release Agreement details ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███. Parikh Decl., Ex. 1 §§ 15(c)-(e). Moreover, AGI7 has a significant defense that the release in the Agreement covers both Cao's liability and its own. *See supra* § II.B.

*Cap Diagnostics* is analogous. 2023 WL 8351561. That case concerned an employment dispute between a company and its former employee, who left the company to start a competitor. Plaintiff Pathnostics alleged that the former employee, Embree, founded the defendant, Emeritus, "using Pathnostics's trade secrets … that he and other former employees of Pathnostics took with them to Emeritus." *Id.* Also, as here, *Cap Diagnostics* involved agreements between the plaintiff and the former employee, containing arbitration provisions that are similar to the provision in the Release Agreement. *Id.* at *4-5. Even though Emeritus was not a signatory to those agreements, the court nevertheless compelled arbitration of the claims under the second prong of the doctrine of equitable estoppel. *Id.*, at *10. In reaching this decision, the court in *Cap Diagnostics* focused on a series of allegations by the plaintiff that echo those made by Turing in this case.

***First***, the court observed that the complaint "seeks to hold Emeritus liable *through the*

13

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

alleged wrongdoing of Embree and Allchin, as the corporate officers of Emeritus." *Id.* at *11. So too here. Turing consistently accuses AGI7 through the acts of its founder and corporate officer, Cao. *See, e.g.*, Compl. at 6 ("Cao Founds AGI7, Using Turing Intellectual Property"); ¶ 11 ("Cao founded AGI7 two weeks later, using Turing's Trade Secrets and Confidential Information."); ¶ 28 ("As the Co-Founder and Chief Executive Officer of Turing, Cao, in particular, had access to a broad range of highly proprietary, trade sect technical, operational, and business information[.] He also had extensive knowledge of Turing's security systems that has allowed him to thwart those systems and obtain Turing's code even after his departure from Turing."). The "relationship among the parties" is of a "nature that justifies a conclusion that the party which agreed to arbitrate with another entity"—here, Turing—"should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement,"— here, AGI7. *In re Apple & AT&T Antitrust Liti.*, 826 F. Supp. 2d 1168, 1177 (N.D. Cal. 2011).

     ***Second***, the court in *Cap Diagnostics* concluded that the plaintiff's claims "rel[ied] on the existence and terms of the[] agreements" containing the arbitration provisions. 2023 WL 8351561, at *11. Although, it observed, those claims included statutory trade secret misappropriation claims that "d[id] not necessarily arise under the agreements in the same way that a breach of contract claim would," it noted that the defendants' alleged knowledge stemmed from the "owed contractual duties" set forth in the agreements signed by the former employee. *Id.* Likewise, Turing alleges misappropriation by AGI7 as well as unfair business practices, both based on Cao's founding of AGI7 allegedly "using Turing's Trade Secrets and Confidential Information." Compl. ¶ 11. As discussed *supra* § IIB, this is the very subject of the Release Agreement. Parikh Decl., Ex. 1 § 15(c) ("██████████████████████████████████ ████████████████████████████████████ [.])[.]"). Even in the cease-and-desist letter it sent to Cao and AGI7, Turing relied upon ██████████████████. Parikh Decl., Ex. 1 (██████████████).

     As in *Cap Diagnostics*, the Court should compel arbitration of Turing's claims and stay this litigation.

2758573

### 2.    The Claims Against AGI7 Are Arbitrable Based on Plaintiff's Allegations that AGI7 and Cao are Alter Egos

Yet another basis for the Court to compel arbitration of the claims against Turing is the alter ego doctrine. Under California law, two conditions must be satisfied to establish applicability of the alter ego doctrine: "First, there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist. Second, there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Borelli v. Black Diamond Aggregates*, *Inc.*, 2017 WL 1063564, at *13 (E.D. Cal. Mar. 21, 2017) (holding the alter ego doctrine permitted a signatory to compel arbitration against a non-signatory).

Importantly, in this context—*i.e.*, a non-signatory seeking to compel arbitration against a plaintiff signatory—the Court need not find that AGI7 and Cao are, in fact, alter egos. Instead, it is "a ***plaintiff's allegations***" of their relationship that "is sufficient" to allow the alleged alter ego "to invoke the benefit of an arbitration agreement[.]" *Michael Yadegari et al v. Ford Motor Company et al*, 2023 WL 11067049 at *3 (C.D. Cal. 2023) ("Nonsignatory alleged alter egos are entitled to compel arbitration[.]"); *see also Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 991 (N.D. Cal. 1996) (same). Nor is it strictly necessary for Turing to have alleged that Cao and AGI7 are alter egos for this doctrine to apply. For instance, in *Borelli*, the complaint made no such allegation, but the court nonetheless held the allegations as pled—including that the signatory had pervasive and continuous control of the non-signatory—were adequate to compel arbitration under the alter ego theory. 2017 WL 1063564, at *14.

Turing effectively alleges that AGI7 and Cao are alter egos by imputing Cao's knowledge and intent to AGI7 and contending that Cao and AGI7's interests are one and the same. Indeed, the Complaint almost exclusively focuses on Cao's purported actions to ground its claims against AGI7—Turing thus complains about Cao's actions as though they are AGI7's actions. *See, e.g.*, Compl. ¶ 11 ("Cao founded AGI7 two weeks [after leaving Turing], using Turing's Trade Secrets and Confidential Information"); ¶ 12 (alleging Cao downloaded Turing's trade secrets from his Turing laptop to an account for AGI7); ¶ 28 ("As the Co-Founder and Chief Executive Officer of

2758573

Turing, Cao . . . had access to a broad range of [Turing's] highly proprietary, trade secret technical, operational, and business information[.]; ¶ 62 ("Cao has a PhD in computer science from the University of Southern California and set up Turing's code, infrastructure, and security systems. On information and belief, Cao has used his knowledge of these [Turing] systems to devise other methods of accessing Turing's Trade Secrets[.]"). These factual allegations, although disputed, "show [Cao] exercised control over [AGI7] that is 'so pervasive and continual' that [AGI7] is but the instrumentality of [Cao] even though separate corporate formalities" may be maintained. *Borelli*, 2017 WL 1063564, at *13.

As further evidence of Turing's allegations of the pervasive and continual relationship between Cao and AGI7, Turing's cease-and-desist letter was sent to ███████████████. *See* Parikh Decl., Ex. 3 ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."). In fact, the letter claims that ████████████████████████████████████████████████████████████████████████████. *Id.*

As such, the Court should permit AGI7 to compel arbitration against Turing. Turing's allegations, though disputed, assert a unity of interest and ownership between AGI7 and Cao and "adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice," in this case against Cao and AGI7. *Borelli*, 2017 WL 1063564, at *14.

**C.     Plaintiff's Claims Against AGI7 Should Be Stayed Pending Arbitration**

Section 3 of the FAA provides that, upon determination that at least some of a plaintiff's claims are subject to arbitration, and upon a party's application, the Court "shall" stay the litigation of those claims pending arbitration. 9 U.S.C. § 3. Because at least some of Turing's claims against AGI7 are arbitrable, the Court must stay litigation of those claims. *See United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 Fed. App'x 412, 415 (9th Cir. 2002); *Lovig,*

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573

2019 WL 2568851, at *3 (explaining "that if 'any issue' is referred to arbitration, the court 'shall' stay the 'action' pending arbitration upon request").

## V.    CONCLUSION

Turing is trying to sue AGI7, in court, over allegations it mounts against Cao. Because its claims fall within the scope of the broad contractual agreement to arbitrate included in the Release Agreement Turing executed with Cao, the Court should compel Turing to arbitrate.


Dated:  August 6, 2024                                  KEKER, VAN NEST & PETERS LLP


                                        By:   /s/ Ajay S. Krishnan
                                              KHARI J. TILLERY
                                              AJAY S. KRISHNAN
                                              PUJA PARIKH

                                              Attorneys for Defendant AGI7 INC.

DEFENDANT AGI7 INC.'S MOTION TO STAY THE ACTION AND COMPEL ARBITRATION;
MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT THEREOF
Case No. 5:24-cv-04606-SVK

2758573