UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TURING VIDEO TECHNOLOGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> AGI7 INC., <br><br> Defendant. | Case No. 24-cv-04606-EKL <br><br> **ORDER GRANTING MOTION TO COMPEL ARBITRATION AND MOTION TO STAY** <br><br> Re: Dkt. Nos. 13, 30 |

Plaintiff Turing Video Technology, Inc. ("Turing") alleges that Defendant AGI7 Inc. ("AGI7") misappropriated its trade secrets and engaged in unfair business practices. Compl. ¶ 6, ECF No. 1-1. AGI7 moves to compel arbitration and to stay this action while arbitration is pending. Mot. to Stay the Action & Compel Arbitration, ECF No. 30 ("Motion"). The Court carefully reviewed the parties' briefs and heard oral argument on October 9, 2024. For the following reasons, the Court GRANTS the motion to compel arbitration and STAYS this action until the arbitration concludes.

I.  **BACKGROUND**[1]

Turing is "an innovative video surveillance and robot platform" and a "pioneer in the field of AI-based surveillance." Compl. ¶ 2. Turing was founded in part by Song Cao, who served as the company's chief executive officer and chairman of its board of directors until July 28, 2023, when the company terminated his employment and removed him from the board. *Id*. ¶¶ 3, 10. On August 5, 2023, Turing told Cao's counsel that it suspected Cao had "retained, or attempted to retain, Turing's intellectual property subsequent to his termination." Mot. Ex. 2 at 21-22.

---

[1] These facts are drawn from the complaint and exhibits to the motion. *See* ECF No. 31. Citations use pagination from the Electronic Case Filing system if the original document lacks pagination.

Specifically, Turing's IT department claimed that Cao "instructed at least one engineer to download Turing's source code and accessed Turing's 'root' file." *Id.* at 20.

On or about August 14, 2023 – while Turing and Cao were negotiating a separation agreement – Cao formed a new business, AGI7. Compl. ¶¶ 5, 41; Mot. Ex. 3 at 1. On August 30, 2023, Turing and Cao executed a mutual release of claims related to Cao's separation from Turing. Mot. Ex. 1 at 1. AGI7 is not a party to the mutual release. *See id.*

Under section 15 of the mutual release, Cao made certain representations and warranties regarding his limited use of Turing's intellectual property after his termination. Relevant here, Cao represented "that he has not and will not use Turing's intellectual property (including but not limited to its code, confidential customer list(s), or confidential investor list(s)) for any purpose (except, when previously employed by the Company, for the benefit of the Company)." Mot. Ex. 1 § 15(c). Cao also acknowledged that he retained a laptop from his employment at Turing and described his limited use of it. *Id.* § 15(d). Cao agreed to "turn over" the laptop "to his outside legal counsel to be securely stored." *Id.* § 15(e). Turing retained the right to either "take control of" the laptop or "retain an independent third-party vendor to image" it to identify any information "that Cao attempted to, or actually did, access, delete, alter, or modify . . . following his Separation Date." *Id.*

The mutual release contains an arbitration clause, which provides that:

> Except for any claim for injunctive relief arising out of a breach of either Party's obligations [] to protect the Company's intellectual property and/or proprietary information . . . , the parties agree to arbitrate, in San Francisco, California through JAMS to the fullest extent permitted by law, any and all disputes or claims arising out of or related to the validity, enforceability, interpretation, performance or breach of this Agreement, whether sounding in tort, contract, statutory violation or otherwise, or involving the construction or application or any of the terms, provisions, or conditions of this Agreement.

*Id.* § 24. Turing and Cao agreed that the mutual release "is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law." *Id.*

2

On April 22, 2024, Turing sent Cao and AGI7 a letter accusing them of "unlawful attempts to steal Turing's intellectual property" and breach of the mutual release. Mot. Ex. 3 at 1. Turing claimed that Cao's new company, AGI7, was "predicated on [Cao's] (mis)use of Turing's intellectual property." *Id*. Turing also claimed that it "detected at least half a dozen unauthorized attempts, by [Cao and AGI7], to access Turing's internal server to obtain unreleased product information and source code." *Id*. at 2. Based on these allegations, Turing accused Cao of making false representations in the mutual release. *Id*. Turing threatened to "immediately take legal action" if Cao and AGI7 failed to cease and desist the alleged misappropriation. *Id*. at 3.

On June 26, 2024, Turing filed its complaint against AGI7, alleging misappropriation of trade secrets under federal and California law, and violations of section 17200 of the California Business and Professions Code. Cao is not a defendant, but the complaint contains numerous allegations about Cao's conduct, and these allegations are the cornerstone of the complaint. For example, Turing alleges that, "in the one-month period" after Cao's termination, Cao used a laptop from his employment at Turing "to transfer Turing's source code into AGI7." *Id*. ¶ 12; *see also id.* ¶¶ 34, 37-39. Turing further alleges that Cao's "extensive knowledge of Turing's security systems" from his time at the company "has allowed [Cao] to thwart those systems and obtain Turing's code even after his departure from Turing." *Id*. ¶ 28. Turing alleges that Cao carried out the alleged misappropriation "at the direction of, for the benefit of, and as part of [his] employment for AGI7." *Id*. ¶ 49.

On August 6, 2024, AGI7 moved to compel arbitration and to stay the action pending arbitration. *See* Mot. at 1-2, 16-17. The parties agree that the mutual release includes a valid and enforceable agreement to arbitrate between Turing and Cao. Opp. at 4, ECF No. 29 ("Turing does not dispute that an agreement to arbitrate exists between Turing and Cao. . . ."). The parties also agree that the arbitration agreement covers all claims in this action, except for Turing's request for injunctive relief. *See* Mot. Ex. 1 § 24. Accordingly, the two questions before the Court are: (1) whether Defendant AGI7 can compel arbitration even though it is not a party to the mutual release that contains the arbitration agreement; and (2) if the Court compels arbitration, whether the Court should stay this action until arbitration concludes.

## II. MOTION TO COMPEL ARBITRATION

### A. Legal Standard

In deciding whether to compel arbitration, a court must determine: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). If the litigation involves a party that is not a signatory to the arbitration agreement, the nonsignatory may "invoke arbitration under the [Federal Arbitration Act] if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp*, 705 F.3d 1122, 1128 (9th Cir. 2013). Here, the parties agree that California law applies. Mot. at 8; Opp. at 4.

Under California law, the doctrine of equitable estoppel permits a nonsignatory to an agreement to enforce an arbitration clause when: (1) the plaintiff must "rely on the terms of the written agreement [containing the arbitration clause] in asserting its claims against the nonsignatory or the claims are 'intimately founded in and intertwined with' the underlying contract"; or (2) the plaintiff "alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement.'" *Kramer*, 705 F.3d at 1128-29 (quoting *Goldman v. KPMG LLP*, 173 Cal. App. 4th 209, 219, 221 (2009)). Under either circumstance, the "*sine qua non* for application of equitable estoppel . . . is that the claims the plaintiff asserts against the nonsignatory must be dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." *Goldman*, 173 Cal. App. 4th at 217-18.

### B. Discussion

AGI7 is not a signatory to the mutual release between Turing and Cao, which contains the arbitration agreement that AGI7 seeks to enforce. As a nonsignatory, AGI7 can enforce the arbitration agreement only if California law provides for enforcement. AGI7 seeks to enforce the arbitration agreement on two grounds: equitable estoppel and alter ego. Because the Court concludes that AGI7 may invoke equitable estoppel to compel arbitration, the Court does not reach the alter ego issue.

4

### 1. Turing's claims are intimately founded in and intertwined with the mutual release.

Equitable estoppel requires arbitration of Turing's claims because they are "intimately founded in and intertwined with" the mutual release that contains the arbitration agreement. *Kramer*, 705 F.3d at 1128. The crux of Turing's complaint is that AGI7 misappropriated Turing's trade secrets based on Cao's alleged misconduct.[2] Compl. ¶¶ 75, 82, 84, 93. The mutual release, at least in part, governs Cao's obligations with respect to Turing's intellectual property and the laptop he obtained from Turing. Mot. Ex. 1 at 12-14. The complaint alleges that Cao used the laptop to illegally "transfer Turing's source code into AGI7" and that he misappropriated Turing's trade secrets through other means. Compl. ¶¶ 12, 28, 34, 37-39. Thus, AGI7's liability turns on Cao's obligations under the mutual release and his alleged breach of those obligations.

It is telling that, shortly before initiating this action, Turing sent a cease-and-desist letter to Cao threatening immediate legal action against him and AGI7 for essentially the same claims asserted in the complaint. *See* Mot. Ex. 3. In the letter, Turing alleged that Cao breached the mutual release by misappropriating Turing's trade secrets and misrepresenting his limited use of Turing's intellectual property. *Id*. Turing asserted that, based on Cao's alleged misconduct – including his alleged breach of the mutual release – "Turing has successful legal causes of action against [Cao and AGI7]" for trade secret misappropriation and unfair competition, among other claims. *Id*. at 2. Thus, Turing's pre-suit letter lays bare the intimate connection between Turing's claims and the mutual release.

Turing argues that the complaint "does not rely on, or even refer to" the mutual release and that Turing's claims "would exist regardless of whether" the mutual release existed. Opp. at 5-6. The fact that Turing now disclaims reliance on the mutual release is not dispositive. The Ninth Circuit's recent decision in *Franklin v. Community Regional Medical Center* is instructive. 998 F.3d 867 (9th Cir. 2021). In that case, a nurse employed by a staffing agency sued the hospital

---

[2] To be sure, Turing's claims of misappropriation rest on other allegations, too. For example, Turing alleges that "AGI7 began systemically recruiting former Turing employees and encouraging them to use their knowledge of Turing's security and systems to illegally access Turing's code and other proprietary information." Compl. ¶ 13; *see also id.* ¶¶ 25, 29. But the focus of the complaint is Cao's alleged conduct, which Turing attributes to AGI7. *See id*. ¶ 75.

5

1    where she worked on assignment, claiming unpaid wages and overtime. *Id*. at 869, 874-75. The

2    nurse's employment was governed by her contract with the staffing agency. *Id.* at 869. The court

3    held that the nurse's claims against the hospital were "intimately founded in and intertwined with"

4    that contract, even though she "could hypothetically sustain her claims" without it. *Id.* at 875-76.

5    The contract included "necessary information" regarding the terms of her work and her rights to

6    compensation. *Id*. at 876. The same is true here. Even if Turing "could hypothetically sustain"

7    its claims without pointing to the mutual release, the "substance of [Turing's] claims is still rooted

8    in" the relationship between Turing and Cao. *See id.* at 875-76. That relationship is governed by

9    the mutual release, which contains necessary information regarding Cao's obligations to Turing.

10         Turing's claims are "intimately founded in and intertwined with" the mutual release for

11    another reason: AGI7 has invoked the mutual release in its defense, arguing that it limits Cao's

12    obligations with respect to Turing's intellectual property. Reply at 5-6, ECF No. 32. The Ninth

13    Circuit has recognized that a nonsignatory defendant may compel arbitration when its defense

14    relies on a signatory's performance under a contract containing an arbitration agreement. *Herrera

15    v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 708-10 (9th Cir. 2024). In *Herrera*, Cathay Pacific

16    canceled the plaintiffs' flight and instructed them to contact their booking agent for a refund. *Id*.

17    at 705. The booking agent claimed that the only remedy was a travel voucher that would soon

18    expire. *Id*. Unsatisfied with this offer, the travelers sued Cathay Pacific. *Id*. at 706. In its

19    defense, Cathay Pacific argued that the agent never submitted a refund request on behalf of the

20    plaintiffs, and that the airline was not involved in the agent's offer of expiring vouchers. *Id*. at

21    708. Cathay Pacific argued that the booking agent violated its own contract with the plaintiffs by

22    creating improper refund restrictions that were not imposed by the airline. *Id*. Because Cathay

23    Pacific's defense relied on the booking agent's performance under its contract with the plaintiffs,

24    Cathay Pacific was entitled to enforce the arbitration agreement contained in that contract. *Id.* at

25    708, 710. Here, the same reasoning applies, except AGI7's defense turns on Cao's purported

26    *compliance* with the mutual release instead of its breach.[3]

---

[3] AGI7 asserts another defense based on the mutual release – it argues that "Turing has released some of the conduct that it now asserts" in this action. Mot. at 10. Turing argues that AGI7's

6

Turing cites several cases to resist equitable estoppel, but in those cases, the connection between the plaintiff's claims and the underlying agreement was abstract or non-existent. In *Kramer*, the court rejected Toyota's attempt to compel arbitration of vehicle service claims that were not related to purchase agreements that contained an arbitration clause. 705 F.3d at 1130-32. In *Murphy v. DirecTV, Inc.*, the court rejected Best Buy's attempt to compel arbitration based on agreements that were "factually irrelevant to Plaintiffs' claims against Best Buy." 724 F.3d 1218, 1230 (9th Cir. 2013). In *Cisco Systems, Inc. v. Chung*, the arbitration agreement said "nothing" about the employee's "obligations with respect to plaintiff's trade secrets." 462 F. Supp. 3d 1024, 1041-42 (N.D. Cal. 2020). Finally, Turing cites *Waymo LLC v. Uber Technologies, Inc.*, in which the court reasoned that if "Waymo can assert its misappropriation claims independent of the existence of the . . . agreements, then it does not *rely* on those agreements for purposes of equitable estoppel." 252 F. Supp. 3d 934, 938 (N.D. Cal. 2017). But the Ninth Circuit's more recent decision in *Herrera* clarifies that claims may be "intimately founded in and intertwined with" an agreement – even when the plaintiff does not invoke the agreement – if the nonsignatory defendant invokes the agreement in its defense. *See Herrera*, 104 F.4th at 708.[4]

In sum, Turing's claims and AGI7's defenses are "intimately founded in and intertwined with" the mutual release of claims. Turing cannot avoid arbitration by foreswearing reliance on the agreement after it decides to sue. *See Franklin*, 998 F.3d at 875. Equitable estoppel "prevents a party from playing fast and loose with its commitment to arbitrate, honoring it when advantageous and circumventing it to gain undue advantage." *Metalclad Corp. v. Ventana Envtl. Org. P'ship*, 109 Cal. App. 4th 1705, 1714 (2003).

---

defense is hopeless because Turing released Cao's conduct "prior to August 30, 2023," and the "conduct alleged in the Complaint did not occur until *after*" that date. Opp. at 8. But some of the conduct challenged in complaint allegedly occurred before August 30, 2023. *See, e.g.*, Compl. ¶¶ 11-12, 31-41. The merits of this defense are for the arbitrator to decide, but its presence further illustrates the intimate connection between Turing's claims and the mutual release.

[4] At oral argument, Turing suggested that equitable estoppel applies differently in trade secret cases. That is not necessarily true. Courts have applied equitable estoppel to compel arbitration of trade secret misappropriation claims. *See, e.g.*, *Chartwell Staffing Servs. v. Atl. Sols. Grp.*, No. 8:19-cv-00642-JLS-JDE, 2020 WL 620294, at *5 (C.D. Cal. Jan. 9, 2020) ("[T]he Court concludes that Chartwell's trade secrets claims are so bound up with the obligations imposed by the Employment Agreements that the reliance circumstance is present.").

7

### 2. Turing alleges substantially interdependent and concerted misconduct by AGI7 and Cao that is intimately connected with the obligations of the mutual release.

Turning to the second basis for equitable estoppel, the Court also finds that Turing "alleges substantially interdependent and concerted misconduct by the nonsignatory [AGI7] and another signatory [Cao] and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the [mutual release].'" *Kramer*, 705 F.3d at 1129 (quoting *Goldman*, 173 Cal. App. 4th at 219). As detailed above, Turing seeks to hold AGI7 liable through Cao's alleged conduct. Turing alleges that AGI7 knowingly misappropriated trade secrets through improper means and relies, in substance, on Cao's obligations under the mutual release to support this claim. *See* Compl. ¶¶ 82, 84, 93. Turing alleges that Cao acted at the direction of and for the benefit of AGI7. *See id*. ¶¶ 49, 56. These allegations assert substantially interdependent and concerted misconduct by AGI7 and Cao that is intimately connected with the obligations of the mutual release. *See, e.g., Cap Diagnostics, LLC v. Emeritus Med. Tech. LLC*, No. 23-cv-05242-JLS-E, 2023 WL 8351561, at *11 (C.D. Cal. Oct. 25, 2023) (applying equitable estoppel in trade secret case because plaintiff sought to "hold [defendant] liable *through* the alleged wrongdoing of" signatories).

Turing argues that the second basis for equitable estoppel does not apply when the plaintiff chooses to sue only a nonsignatory, as Turing has done here by suing AGI7 but not Cao. Opp. at 8. The theory underlying this argument is that Cao's right to arbitrate is not violated so long as he is not thrust into the litigation against AGI7. This argument is not persuasive. The test articulated in *Goldman* and *Kramer* does not turn on whether the plaintiff actually sues a signatory. Rather, it turns on whether the plaintiff "*alleges* substantially interdependent and concerted misconduct by the nonsignatory and another signatory" that is founded in or intimately connected with the obligations of the underlying agreement. *Kramer*, 705 F.3d at 1128-29 (emphasis added). Here, Turing undoubtedly alleges interdependent and concerted misconduct by AGI7 and Cao. Moreover, adopting Turing's position would enable a plaintiff to nullify a defendant's right to arbitrate based on the plaintiff's own litigation tactics in choosing which entities to sue. The problem with that approach is evident here. Although Cao is not a party to the litigation, he is the

1    CEO and founder of Defendant AGI7.  If AGI7 is forced to litigate in federal court, it is likely that
2    Cao would lose the benefits of the arbitration agreement because he will be thrust into litigation as
3    a critical witness.  The Court must look beyond the technicalities of Turing's decision not to name
4    Cao as a defendant.  "[I]t is the substance of the plaintiff's claim that counts," *Franklin*, 998 F.3d
5    at 875, and here, in substance, Turing's claims are brought equally against AGI7 and Cao.

6    For the same reasons, Turing's reliance on other district court cases is misplaced.  In
7    *Brown v. General Steel Domestic Sales, LLC*, the court reasoned that it was "necessary to compel
8    the [plaintiffs] to arbitrate their claims against the non-signatories to preserve the benefit of the
9    arbitration clause for the signatory."  No. 08-00779 MMM (SHx), 2008 WL 2128057, at *8 (C.D.
10   Cal. May 19, 2008).  *Brown* did not hold that equitable estoppel applies *only* when the plaintiff has
11   already initiated arbitration against the signatory.  And as just discussed, compelling arbitration is
12   necessary to preserve "the benefit of the arbitration" agreement for Cao.  Turing also cites *Mance*
13   *v. Mercedes-Benz USA*, 901 F. Supp. 2d 1147 (N.D. Cal. 2012).  In that case the court compelled
14   arbitration on the first basis for equitable estoppel and rejected the second basis only in passing.
15   *Id.* at 1157.  *Mance* relied on *Hawkins v. KPMG LLP*, in which the court observed that equitable
16   estoppel may not apply "where no claim *can be asserted* against the signatory and where
17   arbitration against the signatory *is not possible*" because the signatory is "defunct."  423 F. Supp.
18   2d 1038, 1051 (N.D. Cal. 2006) (emphasis added).  It is reasonable to infer that litigation against a
19   nonsignatory does not prejudice a defunct signatory.  But here, Cao is not "defunct," and his right
20   to arbitrate would be prejudiced by active litigation against AGI7 – the company he leads.[5]

21   In sum, AGI7 has demonstrated that both bases for invoking equitable estoppel apply here.
22   Accordingly, the Court GRANTS AGI7's motion to compel arbitration.

---

[5] *Mance* also relied on an Alabama case, which is not instructive given significant differences between California and Alabama law.  Under Alabama law, a nonsignatory cannot invoke equitable estoppel unless arbitration with a signatory is pending or imminent.  *Hanover Ins. Co. v. Atlantis Drywall & Framing LLC*, 611 F. App'x 585, 590 (11th Cir. 2015).

### III. MOTION TO STAY

#### A. Legal Standard

"Under 9 U.S.C. § 3, a district court must stay proceedings for claims and issues 'referable to arbitration' pending resolution of the arbitration." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 832 (9th Cir. 2019). Additionally, a "district court has inherent power to control the disposition of the causes on its docket in a manner which will promote economy of time and effort for itself, for counsel, and for litigants." *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). In exercising its discretion to grant or deny a stay of non-arbitrable issues, the Court must balance competing interests, including "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law." *Id.*; *see also Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863-64 (9th Cir. 1979) ("A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."); *Synopsys, Inc. v. Siemens Indus. Software Inc.*, No. 20-cv-04151-WHO, 2021 WL 11679003, at *4 (N.D. Cal. Sept. 9, 2021) ("[I]t is well-established and undisputed that courts have discretion to stay non-arbitrable issues.").

#### B. Discussion

The Court must stay this action with respect to the merits of Turing's claims and Turing's request for damages, as those issues are "referable to arbitration." *Blair*, 928 F.3d at 832. But Turing's request for injunctive relief is not referable to arbitration because it is not covered by the arbitration agreement. Mot. Ex. 1 § 24. Thus, the Court must decide whether to stay this action in its entirety, or whether to proceed with litigation of injunctive relief issues while every other issue is arbitrated.[6]

---

[6] AGI7 incorrectly argues that a stay of the entire action is mandatory whenever some claims are referred to arbitration. Mot. at 6, 16-17. For support, AGI7 cites to a non-precedential opinion that directly refutes its position. *United Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002) ("The decision whether to stay the non-arbitrable issues . . . pending arbitration rests with the sound discretion of the district court."). AGI7 also relies on *Lovig v. Best Buy Stores LP*, No. 18-cv-02807-PJH, 2019 WL 2568851 (N.D. Cal. June 21, 2019).

10

After balancing the competing interests, the Court concludes that a stay of this action is appropriate. "[S]taying the entire action is more judicially efficient because of the possibility of substantially simplifying the issues and the risk of wasting judicial resources if the entire action is not stayed." *Synopsys*, 2021 WL 11679003, at *5. In this case, an arbitrator will decide all issues except for Turing's entitlement to injunctive relief. But to obtain a permanent injunction, Turing must first establish AGI7's liability – which an arbitrator, not the Court, must decide. The arbitrator's rulings on liability may end the matter in AGI7's favor. Alternatively, if AGI7 is found liable, the arbitrator's rulings – and damages award, if any – will streamline this Court's resolution of injunctive relief issues. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (A plaintiff seeking a permanent injunction must demonstrate that it "has suffered an irreparable injury" and "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury."). Thus, staying the action in its entirety until arbitration concludes will promote orderly and efficient resolution of all issues. A stay will also protect AGI7 from the hardship and inequity of being required to proceed with litigation on substantially the same issues in two forums, which would be inconsistent with the purposes of the Federal Arbitration Act.

The only factor that counsels against a stay pending arbitration is the potential harm to Turing. But Turing has not identified any imminent, non-speculative harm that would result from a stay. Turing's request for injunctive relief is boilerplate. *See* Compl. ¶ 96 ("Turing has suffered and will continue to suffer irreparable harm if AGI7's misconduct is not enjoined."). And, according to the complaint, AGI7 has been marketing and pitching its "Copycat Product to Turing's confidential customer list" for more than a year already. *Id.* ¶ 46. These allegations, while serious, do not establish that a stay pending arbitration would prejudice Turing.

In sum, Turing's request for injunctive relief is inherently bound up with the merits of Turing's arbitrable claims. A stay of this action will promote judicial economy and will avoid the hardship and inefficiency of dual-track litigation and arbitration. The possible harm to Turing that may result from a stay is not sufficiently imminent or material to outweigh these considerations.

---

But shortly after *Lovig*, the Ninth Circuit clarified that a party moving to compel arbitration is entitled to a stay of only those issues that are "referable to arbitration." *Blair*, 928 F.3d at 832.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to compel arbitration as to all claims, except for Turing's request for injunctive relief. Additionally, the Court GRANTS the motion to stay this action in its entirety until arbitration concludes. The parties shall file an initial joint status report regarding arbitration by September 10, 2025, and updated joint status reports every six months thereafter. If the parties resolve the claims at issue, through arbitration or otherwise, the parties shall notify the Court within seven days of the resolution.

**IT IS SO ORDERED.**

Dated: February 21, 2025

Eumi K. Lee
United States District Judge